No. 12-20379

Consolidated with 14-20626

# In the United States Court of Appeals
# for the Fifth Circuit

---

WILLIAM SCOTT,

*Plaintiff-Appellee,*

v.

BRAD LIVINGSTON, Texas Department of Criminal Justice
Executive Director,

*Defendant-Appellant.*

---

On Appeal from the United States District Court for the
Southern District of Texas, Houston Division
Case No. 4:69-cv-0074

---

APPELLANT'S REPLY BRIEF

---

KEN PAXTON
Attorney General of Texas

CHARLES E. ROY
First Assistant Attorney General

OFFICE OF THE ATTORNEY
  GENERAL
P.O. Box 12548 (MC 059)
Austin, Texas  78711-2548
Tel.: (512) 936-2221
Fax: (512) 474-2697
Alex.Potapov@texasattorneygeneral.gov
COUNSEL FOR
  DEFENDANT-APPELLANT

SCOTT A. KELLER
Solicitor General

ALEX POTAPOV
DOUGLAS D. GEYSER
Assistant Solicitors General

AUTUMN HAMIT PATTERSON
Assistant Attorney General

# TABLE OF CONTENTS

Table of Authorities...................................................................... iii

Introduction.................................................................................1

Argument....................................................................................1

    I.    Scott's Claims Should Have Been Dismissed.........................1

        A.    The Controversy Between The Parties Became Moot.....................................................................................1

        B.    The Parties Agreed To Settle The Case.........................6

    II.    Scott's Claims Are Meritless.................................................13

        A.    The Direct-Supervision Requirement Does Not Violate The Establishment Clause..............................13

        B.    The Direct-Supervision Requirement Does Not Violate RLUIPA..............................................................16

            1.    The Direct-Supervision Requirement Does Not Impose A Substantial Burden......................17

            2.    The Direct-Supervision Requirement Is The Least Restrictive Means Of Achieving TDCJ's Compelling Interests..............................18

    III.    The Court Imposed An Unwarranted Remedy.....................27

        A.    The Court Should Have Accepted The Scott Plan.......27

        B.    The Court's Remedy Violates The PLRA.....................27

            1.    The Injunction Is Not Narrowly Drawn.............27

            2.    The Court Did Not Give Sufficient Weight To Public Safety.......................................................32

Conclusion ............................................................................... 33

Certificate of Service ............................................................... 34

Certificate of Compliance ........................................................ 35

# TABLE OF AUTHORITIES

## Cases

*Adkins v. Kaspar*,
    393 F.3d 559 (5th Cir. 2004) ..................................................... 14, 17

*Amedisys, Inc. v. Kingwood Home Health Care, LLC*,
    437 S.W.3d 507 (Tex. 2014) .............................................................. 6

*Bader v. Wrenn*,
    675 F.3d 95 (1st Cir. 2012) .............................................................. 21

*Baranowski v. Hart*,
    486 F.3d 112 (5th Cir. 2007) .................................................... 16, 17

*Bauer v. Texas*,
    341 F.3d 352 (5th Cir. 2003) ............................................................ 2

*Ben-Levi v. Brown*,
    No. 5:12-CT-3193-F, 2014 WL 7239858
    (E.D.N.C. Dec. 18, 2014) ......................................................... 20, 21

*Betts v. Betts*,
    No. 14-11-00267-CV, 2012 WL 2803750
    (Tex. App.—Houston [14th Dist.] July 10, 2012,
    pet. denied) ...................................................................................... 11

*Brown v. Plata*,
    131 S. Ct. 1910 (2011) .................................................................... 32

*Burwell v. Hobby Lobby Stores, Inc.*,
    134 S. Ct. 2751 (2014) .................................................................... 26

*Bustillos v. State*,
    213 S.W.2d 837 (Tex. Crim. App. 1948) ........................................ 11

*Chance v. TDCJ*,
    730 F.3d 404 (5th Cir. 2013) ................................. 14, 18, 20, 26, 32

iii

*CherCo Props., Inc. v. Law, Snakard & Gambill, P.C.*, 985
    S.W.2d 262 (Tex. App.—Fort Worth 1999, no pet.) ......................8, 9

*Children's Healthcare Is a Legal Duty, Inc. v. Min De Parle*,
    212 F.3d 1084 (8th Cir. 2000) ........................................................ 16

*Countryman v. Palmer*,
    No. 3:11-CV-00852-ECR-VPC, 2012 WL 4340659
    (D. Nev. Aug. 7, 2012) .....................................................................21

*Cruz v. Beto*,
    405 U.S. 319 (1972) .........................................................................15

*Cutter v. Wilkinson*,
    544 U.S. 709 (2005) .........................................................................22

*Davis v. Wall*,
    50 F.3d 1033 (5th Cir. 1995) ..........................................................25

*De'Lonta v. Johnson*,
    No. 7:11-CV-00175, 2012 WL 2921762
    (W.D. Va. July 17, 2012) .................................................................21

*DeMoss v. Crain*,
    636 F.3d 145 (5th Cir. 2011) ..........................................................25

*E.P. Towne Ctr. Partners, L.P. v. Chopsticks, Inc.*,
    242 S.W.3d 117 (Tex. App.—El Paso 2007, no pet.) ........................9

*Edwards v. Johnson*,
    209 F.3d 772 (5th Cir. 2000) ...........................................................4

*Ericson v. Magnusson*,
    No. 2:12-CV-00178-JAW, 2013 WL 2634761
    (D. Me. June 12, 2013) ....................................................................21

*Estate of Martineau v. ARCO Chem. Co.*, 203 F.3d 904
    (5th Cir. 2000) ..................................................................................9

*Gen. Metal Fabricating Corp. v. Stergiou*,
  438 S.W.3d 737 (Tex. App.—Houston [1st Dist.]
  2014, no pet.) ................................................................. 7, 9

*Genesis Healthcare Corp. v. Symczyk*,
  133 S. Ct. 1523 (2013) ................................................. 3, 4

*Gonzales v. O Centro Espirita Beneficente Uniao de Vegetal*,
  546 U.S. 418 (2006) ......................................................... 26

*Gresham v. Hawk*,
  244 F.3d 133 (5th Cir. 2000) ............................................ 4

*Guajardo v. TDCJ*,
  363 F.3d 392 (5th Cir. 2004) .......................................... 29

*Guess v. McGill*,
  No. 9:13-CV-02260-TLW, 2014 WL 5106735
  (D. S.C. Oct. 10, 2014) ................................................... 20

*Hall v. Sutton*,
  581 F. App'x 580 (7th Cir. 2014) .................................... 20

*Hartford Lloyd's Ins. Co. v. Teachworth*,
  898 F.2d 1058 (5th Cir. 1990) .................................. 31, 32

*Hathcock v. Cohen*,
  287 F. App'x 793 (11th Cir. 2008) ............................ 20, 21

*Herman v. Holiday*,
  238 F.3d 660 (5th Cir. 2001) ............................................ 4

*Holt v. Hobbs*,
  135 S. Ct. 853 (2015) ................................................ 22, 26

*Horne v. Flores*,
  557 U.S. 433 (2009) ......................................................... 29

*Howard v. Wiglesworth,*
    No. 5:10-CV-163-RHW, 2012 WL 3867011
    (S.D. Miss. Sept. 5, 2012) ............................................................ 21

*Hyde v. TDCJ,*
    948 F. Supp. 625 (S.D. Tex. 1996) ................................................ 30

*In re Liljeberg Enters., Inc.,*
    304 F.3d 410 (5th Cir. 2002) ........................................................ 32

*In re Navy Chaplaincy,*
    738 F.3d 425 (D.C. Cir. 2013) ...................................................... 16

*Jihad v. Fabian,*
    No. 09-1604, 2011 WL 1641885
    (D. Minn. Feb. 17, 2011) .............................................................. 20

*Johnson-Bey v. Lane,*
    863 F.2d 1308 (7th Cir. 1988) ...................................................... 20

*Koenick v. Felton,*
    190 F.3d 259 (4th Cir. 1999) ........................................................ 16

*Larson v. Valente,*
    456 U.S. 228 (1982) ...................................................................... 16

*Leishman v. Patterson,*
    No. 2:11-CV-00309-CW, 2014 WL 2117543
    (D. Utah May 21, 2014) ................................................................ 20

*Longoria v. Dretke,*
    507 F.3d 898 (5th Cir. 2007) ........................................................ 19

*Manges v. Harman,*
    No. 3:11-CV-369-PPS, 2014 WL 5488457
    (N.D. Ind. Oct. 29, 2014) ........................................................ 20, 25

*Mayfield v. TDCJ,*
    529 F.3d 599 (5th Cir. 2008) ........................................................ 19

*McAlister v. Livingston,*
   348 F. App'x 923 (5th Cir. 2009) .................................................... 18

*McCreary County v. ACLU,*
   545 U.S. 844 (2005) ...................................................................... 15

*McElhaney v. Elo,*
   202 F.3d 269 (6th Cir. 2000) ........................................................ 20

*Montague v. Corr. Corp. of Am.,*
   No. 3:10-CV-0443, 2011 WL 3476543
   (M.D. Tenn. Aug. 8, 2011) ............................................................ 21

*Morrison v. Cook,*
   No. 97-57-ST, 1999 WL 717218 (D. Or. Apr. 27, 1999) ................. 21

*Newby v. Quarterman,*
   325 F. App'x 345 (5th Cir. 2009) .................................................... 18

*Odneal v. Pierce,*
   324 F. App'x 297 (5th Cir. 2009) .................................................... 17

*Oliver v. Scott,*
   276 F.3d 736 (5th Cir. 2002) .......................................................... 4

*Reprosystem, B.V.* v. *SCM Corp.,*
   630 F. Supp. 1099 (S.D.N.Y. 1986) ............................................... 11

*Sossamon v. Lone Star State of Tex.,*
   560 F.3d 316 (5th Cir. 2009) .......................................................... 3

*Strutton v. Meade,*
   No. 4:05-CV-02022-ERW, 2010 WL 1253715
   (E.D. Mo. Mar. 31, 2010) ............................................................... 21

*Tamfu v. Ashcroft,*
   54 F. App'x 408 (5th Cir. 2002) ...................................................... 4

*TrueStar Petroleum Corp. v. Eagle Oil & Gas Co.,*
   323 S.W.3d 316 (Tex. App.—Dallas 2010, no pet.) ......................... 8

vii

*Turner v. Safley,*
    482 U.S. 78 (1987) ........................................................25

*Turner v. Hamblin,*
    590 F. App'x 616 (7th Cir. 2014) ............................20, 21

*United States v. Juvenile Male,*
    131 S. Ct. 2860 (2011) ..................................................3

*Valley Ranch Dev. Co. v. FDIC,*
    960 F.2d 550 (5th Cir. 1992) ......................................10

*Vanegas v. Am. Energy Serv's,*
    302 S.W.3d 299 (Tex. 2009)........................................11

*Vega v. Lantz,*
    No. 3:04-CV-1215-DFM, 2013 WL 6191855
    (D. Conn. Nov. 26, 2013) (mem. op.) .......................20, 21

*William B. Shultz, Sr. Family Living Q-Tip Trust v.*
    *Franklin Credit Mgmt. Corp.,* No. 07-96-0396-CV,
    1997 WL 260068 (Tex. App.—Amarillo May 19, 1997,
    no pet.) ........................................................................11

*Williamson v. Bank of New York Mellon,*
    947 F. Supp. 2d 704 (N.D. Tex. 2013) ......................7, 11

## Statutes

18 U.S.C. § 3626(a)(1)(A)..............................................27, 32

TEX. GOV'T CODE § 311.005(6) ...............................................11

## Other Authorities

National Prison Rape Elimination Commission Report
    6 (June 2009) ...............................................................20

## INTRODUCTION

Scott's brief fails to rehabilitate the district court's conclusions on any contested issue. It remains true that the case became moot; that the parties entered a valid settlement agreement; and that the direct-supervision requirement is entirely consistent with the Establishment Clause as well as RLUIPA. Finally, Scott offers no compelling defense of the district court's overbroad injunction, which hobbles TDCJ's ability to respond to emergencies.

## ARGUMENT

## I.   SCOTT'S CLAIMS SHOULD HAVE BEEN DISMISSED

### A.   The Controversy Between The Parties Became Moot

**1.** The relevant facts are largely undisputed. *See* Appellant's Br. ("Br.") 7-8, 14-15, 35. First, by the time of the trial, there were five permanent Jehovah's Witness volunteers supervising religious gatherings at the Huntsville Unit, and Scott himself believed that services would be uninterrupted there going forward. ROA.1958, 1945, 529, 1931; *see* ROA.1922.[1] In any event, Scott was no longer at the

---

[1] As a result of two docket numbers being consolidated in this appeal, the parties' briefs referred to different versions of the record on appeal. *See* Scott Br. 2 n.1. After consultation with the Clerk's Office, we concluded that it would be more straightforward to use the record compiled in No. 14-20626 in this Reply.

Huntsville Unit. After a vote by the Board of Pardons and Paroles, he was transferred to the Hightower Unit in order to complete a treatment program. ROA.645-46. Scott has never suggested he was likely to return to Huntsville. To the contrary, he was slated to remain at the Hightower Unit until he could be released on parole, ROA.649, as he eventually was, ROA.2059.[2] And Jehovah's Witness inmates at the Hightower Unit enjoyed regular services, totaling four hours a week, provided by five Jehovah's Witness volunteers. ROA.656.

The legal implications are straightforward. First, Scott could no longer demonstrate "either continuing harm or a real and immediate threat of repeated injury in the future." *Bauer v. Texas*, 341 F.3d 352, 358-59 (5th Cir. 2003); *see* Br. 36 (discussing similar cases). Second, his injury was no longer redressable. As the district court held, and Scott does not dispute, his requested injunction applied only to the Huntsville Unit. ROA.265; *see* Br. 14. Accordingly, even if he had a sufficient injury, his requested relief would no longer redress it. *See United States v.*

---

[2] Scott suggests that he "was moved to at least one other unit during his incarceration." Scott Br. 11-12. This is misleading. He was placed in the Powledge Unit only after being released on parole, and only because he violated his parole. ROA.2059-61, 2056; *see* Br. 19. It is also worth noting that Scott has never suggested that there is any shortage of Jehovah's Witness services at the Powledge Unit.

*Juvenile Male*, 131 S. Ct. 2860, 2864 (2011) (per curiam) (requiring redressability through every stage of litigation). In short, Scott had lost the personal stake in the litigation that is required to avoid mootness. *Genesis Healthcare Corp. v. Symczyk*, 133 S. Ct. 1523, 1528 (2013).

**2.** The district court ignored these issues altogether. Br. 37-39. Scott does not attempt to defend the district court's approach, and he makes only a cursory effort to suggest that he should benefit from the "capable of repetition but evading review" exception to mootness doctrine. Scott Br. 12; *see* Br. 36-37 (explaining why the exception is inapplicable).

Instead, Scott (at 11) attempts to shift the burden to the State by invoking the principle that a party whose "voluntary cessation of a challenged practice" apparently moots the case must show that "the allegedly wrongful behavior could not reasonably be expected to recur." *Sossamon v. Lone Star State of Tex.*, 560 F.3d 316, 325 (5th Cir. 2009) (internal quotation marks omitted). This is mistaken for several reasons.

First, and most fundamentally, there was *no voluntary cessation of the challenged practice* in this case. As Scott acknowledges, "the State did not cease its practice of requiring volunteers for Jehovah's Witness services, nor did it offer to make religious services available to Scott

3

specifically regardless of the availability of volunteers." Scott Br. 11. In other words, the challenged policy remained the same; it is simply that, due to "intervening circumstance[s]," Scott was no longer harmed by it. *Genesis*, 133 S. Ct. at 1528.

Scott insists, however, that the decision to "transfer[] Scott to a different unit" should be regarded as an act of voluntary cessation. Scott Br. 11. This flies in the face of this Court's repeated holdings that prison transfers can moot prisoners' claims. *See, e.g.*, *Oliver v. Scott*, 276 F.3d 736, 741 (5th Cir. 2002) (noting that "[t]he transfer of a prisoner out of an institution often will render his claims for injunctive relief moot"); *Herman v. Holiday*, 238 F.3d 660, 665 (5th Cir. 2001) (noting that "the possibility of transfer back to [the original unit] is too speculative to warrant relief"); *Edwards v. Johnson*, 209 F.3d 772, 776 (5th Cir. 2000); *see also Tamfu v. Ashcroft*, 54 F. App'x 408, *1 (5th Cir. 2002) (per curiam); *Gresham v. Hawk*, 244 F.3d 133, *1 (5th Cir. 2000) (per curiam).

And even if a transfer *could* constitute voluntary cessation, that is not the case here. After all, the transfer was not initiated by Defendant-Appellant Livingston or any of his TDCJ subordinates, and there is no allegation that it was done for litigation purposes. Instead, it was

initiated by the independent Board of Pardons and Paroles, a nonparty to this case, which concluded that Scott could be released on parole after completing a treatment program available at the Hightower Unit. ROA.645-46. This decision cannot be attributed to TDCJ.

In any event, the case would have become moot even absent the transfer. By the time of the bench trial, there were multiple Jehovah's Witness volunteers providing regular services at the Huntsville Unit. ROA.1958, 1945, 529; *see* Br. 35. Scott himself did not expect any service interruptions going forward. ROA.1931; *see* Br. 35. So Scott would have lacked a sufficient threat of injury even without TDCJ's supposed voluntary cessation of the challenged practice.

Finally, TDCJ could meet the voluntary cessation test even if it applied, because Scott's problem was not likely to recur. He was slated to remain in a unit with regular Jehovah's Witness services until he was released on parole. After that, it was only his own wrongdoing that could cause him to be reincarcerated; and in any event, Scott has not identified even one unit with ongoing disruptions in Jehovah's Witness services.

### B.     The Parties Agreed To Settle The Case

**1.**     Scott studiously avoids the plain language of the settlement agreement, which unmistakably reflects the parties' intention to be bound.  *See, e.g., Amedisys, Inc. v. Kingwood Home Health Care, LLC*, 437 S.W.3d 507, 514 (Tex. 2014) (courts must "ascertain the intentions of the parties as expressed in the instrument").  To review: in a document signed by Scott and attorneys for TDCJ, Scott "affirm[ed]" that he had "voluntarily and freely met with counsel for [TDCJ] to discuss the settlement of my case." ROA.938.  He went on to state that "[a]s a result of said discussion, *I hereby agree to a full and final-settlement of the above-referenced matter* upon delivery of the sum of $3,000 by Defendant." ROA.938 (emphasis added).  Scott "further attest[ed] that in exchange for the settlement amount, *Defendant will be entitled to a signed release and dismissal with prejudice of all of my claims and costs as Plaintiff herein.*" ROA.938 (emphasis added).

The clear message of the text is reinforced by the parties' conduct (which Scott similarly ignores).  Most significantly, the day after the agreement was signed, TDCJ filed an unopposed motion to stay proceedings in light of the "agreed settlement." ROA.795.  The motion

6

stated that the parties had "come to an amicable agreement to settle the suit," and noted that Scott was "in agreement with and unopposed to the motion." ROA.796, 798. Scott made no objection to this motion at any time. The motion serves as further compelling evidence that the parties intended to make a binding settlement. *Williamson v. Bank of New York Mellon*, 947 F. Supp. 2d 704, 711 (N.D. Tex. 2013) (noting that parties had made a filing stating that they "had 'reached an agreement on terms of settlement'").

Scott has no answer to this evidence of the parties' intent, or to the agreement's plain text. Nevertheless, he advances a welter of arguments against enforcing the agreement. None are valid.

**2.** First, Scott insists that the agreement was only an "agreement to agree," because it fails to include certain material terms. Scott Br. 13-15. *See Gen. Metal Fabricating Corp. v. Stergiou*, 438 S.W.3d 737, 744 (Tex. App.—Houston [1st Dist.] 2014, no pet.) (explaining that a contract without material terms is an unenforceable agreement to agree). However, Texas courts are clear that the material terms for settlement agreements are precisely the terms included in this agreement: namely, payment and release of claims. *See, e.g.*, *id.* at 745.

For instance, in *CherCo Properties, Inc. v. Law, Snakard & Gambill, P.C.*, the court observed that "[t]he parties' settlement agreement contained all the material terms" because the defendants agreed to pay the plaintiff a specified sum "in exchange for [plaintiff's] release of liability." 985 S.W.2d 262, 266 (Tex. App.—Fort Worth 1999, no pet.). It is just the same here: TDCJ agreed to pay Scott $3,000 in exchange for a release of liability.[3]

Scott apparently believes that a "material" term is simply a term that he views as important, regardless of whether it is in any way tethered to the agreement he actually signed. For instance, he insists that it was "highly material" to him to be able to review and approve a new administrative directive. Scott Br. 15-16. Similarly, he suggests that the precise manner of payment was important to him. Scott Br. 15. But nothing about the agreement itself indicates that either of those points were genuinely material. *See TrueStar Petroleum Corp. v. Eagle Oil & Gas Co.*, 323 S.W.3d 316, 319 (Tex. App.—Dallas 2010, no pet.)

---

[3] Scott insists there is some ambiguity regarding "what claims would be released." Scott Br. 15-16. But the agreement could hardly be plainer: "Defendant will be entitled to a signed release and dismissal with prejudice of all of my claims and costs as Plaintiff [in this case]." ROA.938.

(explaining that a term is material if "the contract expressly makes [the term] of the essence or if something in the nature and purpose of the contract and the surrounding circumstances make it apparent that parties intended [the term to] be of the essence"). Time for performance, for instance, is not a material term in a settlement agreement (absent an express statement to that effect). *See CherCo*, 985 S.W.2d at 266; *Estate of Martineau v. ARCO Chem. Co.*, 203 F.3d 904, 910 (5th Cir. 2000). Scott has made no effort to explain why the terms he identifies are any more significant. *See E.P. Towne Ctr. Partners, L.P. v. Chopsticks, Inc.*, 242 S.W.3d 117, 122 (Tex. App.—El Paso 2007, no pet.) ("[T]he agreement's silence as to non-essential, or collateral, matters is not fatal.").

Nor does it help Scott that TDCJ later suggested a further agreement with additional terms. Scott Br. 14. Texas courts have explained that an agreement may be binding even if it expressly contemplates "a more formal document [to] be executed at a later date." *Stergiou*, 438 S.W.3d at 748. This case is even easier because the February 12 agreement does *not* contemplate any future document. There is simply no basis for asserting that, by seeking to agree on

additional details, TDCJ somehow forfeited its earlier binding agreement.[4]

    **3.**    Scott puts forward two additional arguments to suggest that the parties did not intend to be bound.  First, he points (at 14) to the provision making the settlement amount "contingent upon approval by [Texas officials]."  ROA.938.  But that is simply a condition precedent.  Br. 18 & n.2 (citing *Valley Ranch Dev. Co. v. FDIC*, 960 F.2d 550, 553 (5th Cir. 1992)).  Of course, a condition precedent must be satisfied before an obligation accrues—and that is precisely what happened here when TDCJ secured the requisite approvals.  Br. 19.

    Second, Scott argues that the signatures of the lawyers for TDCJ do not convey an intent to be bound because they are prefaced with the word "witnessed."  Scott Br. 14-15.  Scott cites no authority for this proposition, which is at odds with the flexible Texas approach to contractual signatures.  "To sign an instrument or document is to make

---

[4] Scott also notes that the draft agreement TDCJ proposed in June 2013 required him to warrant that the agreement had been reviewed by his attorney.  Scott Br. 15 (citing ROA.1045).  Scott asserts that "[i]f the agreement had actually been reached in February, that statement would be untrue."  Scott Br. 15.  But the phrase "the agreement" in the June draft agreement quite plainly refers to that agreement itself, and has no bearing on the separate February 12 agreement.

*any mark* upon it in token of knowledge, approval, acceptance or obligation." *Bustillos v. State*, 213 S.W.2d 837, 841 (Tex. Crim. App. 1948) (internal quotation marks omitted and emphasis added); *see also Betts v. Betts*, No. 14-11-00267-CV, 2012 WL 2803750, at *2 (Tex. App.— Houston [14th Dist.] July 10, 2012, pet. denied) (mem. op.); TEX. GOV'T CODE § 311.005(6) (defining "signed" as "any symbol executed or adopted by a person with present intention to authenticate a writing"). Courts have recognized that even an automatically generated email signature block can function as a signature—especially when the intent to be bound was otherwise corroborated by the parties' filings, as it was here. *See Williamson*, 947 F. Supp. 2d at 710.[5]

**4.** Finally, Scott relies heavily on arguments that are irrelevant by his own admission. As he correctly points out, Texas Rule of Civil

---

[5] Even if there were insufficient evidence that TDCJ intended to be bound, Scott clearly did. Accordingly, the agreement is at worst a unilateral contract which became binding when TDCJ accepted Scott's offer by performance when it delivered the $3,000 payment. Br. 19; *see Vanegas v. Am. Energy Serv's*, 302 S.W.3d 299, 303 (Tex. 2009) (explaining that a unilateral contract becomes binding once a party accepts the offer by performing); *William B. Shultz, Sr. Family Living Q-Tip Trust v. Franklin Credit Mgmt. Corp.*, No. 07-96-0396-CV, 1997 WL 260068, at *7 (Tex. App.—Amarillo May 19, 1997, no pet.) (noting that a settlement agreement could be construed to be a unilateral contract); *Reprosystem, B.V.* v. *SCM Corp.*, 630 F. Supp. 1099, 1101 (S.D.N.Y. 1986) (holding that a settlement agreement was a unilateral contract).

Procedure 11 would prevent any oral settlement agreement from being enforced here. Scott Br. 16. And as the opening brief explained, evidence of oral terms would also be inadmissible under the parol evidence rule. Br. 42-43.

In spite of his apparent concession that any alleged oral terms are unenforceable, Scott repeatedly relies on such terms. For instance, he complains that the State did not pay him within 120 days. Scott Br. 17. But there is no such term in the text of the agreement, and it is simply irrelevant—even if true—that "the State's attorneys told Scott that the funds would be available within 120 days." Scott Br. 17.[6] It is equally irrelevant whether Scott orally insisted on seeing a copy of a new administrative directive before he would agree to the settlement. Scott Br. 17.

Similarly, Scott makes much of supposed misrepresentations by attorneys for TDCJ. He suggests, for instance, that they led him to believe that the document "was only meant to show the district court that

---

[6] Scott has not argued that any "reasonable time" term should be read into the agreement. In any event, the State provided the payment within 130 days, *see* ROA.1036, 1038. This is a manifestly reasonable period (especially because Scott concedes that 120 days would be acceptable).

settlement negotiations were in progress." Scott Br. 14. The district court did not credit these allegations. And in any event, Scott has never argued that he was defrauded into signing the agreement. Indeed, any such argument would fail because the alleged misrepresentations are both inadmissible and legally irrelevant. Br. 43-44.

## II.   SCOTT'S CLAIMS ARE MERITLESS

### A.   The Direct-Supervision Requirement Does Not Violate The Establishment Clause

**1.**   As the opening brief explained, Scott has no genuine Establishment Clause claim. This is because he seeks additional accommodations for *himself* rather than objecting to religious accommodations provided to others. Br. 45-47 (collecting cases). Scott offers no response to this argument.

The opening brief also noted that, if Scott *does* have an Establishment Clause claim, that claim must be subjected to the *Turner v. Safley* standard. Br. 47. Because Scott is demanding affirmative action from prison officials, his claim threatens to interfere with prison administration just as much as any free exercise or equal protection claim. Accordingly, it should be evaluated under the same standard. Br. 49-50 & n.11. In other words, even if there is a general Establishment

Clause exception to *Turner*—and there is not—it would not apply here. Br. 47-48.

Scott does not address this argument either, even though it is fatal to his position. The direct-supervision requirement—which is "reasonable and necessary," *Chance v. TDCJ*, 730 F.3d 404, 415 (5th Cir. 2013)—easily survives the permissive *Turner* test.

**2.** Even assuming ordinary Establishment Clause scrutiny applies, the direct-supervision requirement poses no constitutional difficulty. Scott does not defend the district court's holding that TDCJ discriminated against Jehovah's Witnesses, in effect, by complying with the *Brown* consent decree governing Muslims. ROA.681-82. As the opening brief explained, the Establishment Clause does not require TDCJ to extend the benefits of the *Brown* consent decree to all faiths. Br. 51-53. Indeed, this Court has repeatedly endorsed the direct-supervision requirement, with full awareness of the special status of Muslims. Br. 53-54 (citing, *e.g.*, *Adkins v. Kaspar*, 393 F.3d 559, 566 (5th Cir. 2004)).

Scott now offers an alternative theory. He suggests that the direct-supervision requirement, although it is facially neutral, discriminates against Jehovah's Witnesses because it has the *effect* of allowing more

services for other faiths (which attract more volunteers).  Scott Br. 31-32.

As a result, Scott argues, those faiths also enjoy additional resources in

the form of meeting space, volunteer training, and staff-provided

security.  Scott Br. 32.  This argument suffers from several fundamental

defects.

First, the Supreme Court has made clear that the Establishment

Clause does *not* require "that every religious sect or group within a prison

. . . must have identical facilities or personnel."  *Cruz v. Beto*, 405 U.S.

319, 322 n.2 (1972) (per curiam).  Instead, prisons must provide exactly

what the Scott Plan provides: "reasonable opportunities [for] all prisoners

to exercise . . . religious freedom."  *Ibid.*

More generally, the "touchstone" of the Establishment Clause is

governmental neutrality.  *McCreary County v. ACLU*, 545 U.S. 844, 860

(2005).  And the Scott Plan is neutral both facially and in operation.  Far

from seeking to harm any religious group, it was designed to eliminate

any unequal treatment among religions, while providing adequate

security and ensuring that all faiths are able to conduct religious

services. Br. 22-23.  Accordingly, *Larson v. Valente* is inapposite.  *Larson*

concerned a piece of legislation which was "drafted with the explicit

15

intention of including particular religious denominations and excluding others." 456 U.S. 228, 254 (1982). Scott has not even alleged anything similar about the Scott Plan, nor could he.[7]

Finally, this Court's cases teach that any variation in the availability of services is caused by variation in the availability of volunteers, and *not* by the direct-supervision requirement. *See, e.g.*, *Baranowski v. Hart*, 486 F.3d 112, 126 (5th Cir. 2007). In other words, the asserted disparity cannot create an Establishment Clause problem because it cannot be attributed to TDCJ.

## B. The Direct-Supervision Requirement Does Not Violate RLUIPA

This Court's precedents—which Scott ignores—foreclose his argument under *both* prongs of the RLUIPA analysis.

---

[7] Scott begs the question when he asserts that the regulation should be subjected to strict scrutiny because it "violate[s] the Establishment Clause." Scott Br. 30. In reality, strict scrutiny would be out of place here. *See, e.g.*, *In re Navy Chaplaincy*, 738 F.3d 425, 430 (D.C. Cir. 2013) (no strict scrutiny for facially neutral policies); *Koenick v. Felton*, 190 F.3d 259, 264 (4th Cir. 1999) (strict scrutiny only for facially discriminatory policies); *Children's Healthcare Is a Legal Duty, Inc. v. Min De Parle*, 212 F.3d 1084, 1091 (8th Cir. 2000) (strict scrutiny only where there is no neutral, secular basis for the policy). Even if strict scrutiny did apply, the direct supervision requirement would survive it for the same reasons it survives RLUIPA review. *See* Section II.B, *infra*.

### 1. The Direct-Supervision Requirement Does Not Impose A Substantial Burden

The first RLUIPA step requires the prisoner to demonstrate that the challenged government action substantially burdens religious exercise. In *Adkins*, this Court explained that the direct-supervision requirement imposed no burden because the plaintiff's inability to conduct group meetings on his holy days "result[ed] . . . from a dearth of qualified outside volunteers," rather than from any direct prohibition. 393 F.3d at 571. The Court followed this principle in *Baranowski*, 486 F.3d at 125, and *Odneal v. Pierce*, 324 F. App'x 297, 302 (5th Cir. 2009) (per curiam). The logic of these cases applies here in precisely the same way: any burden experienced by Scott is caused by the limited number of Jehovah's Witness volunteers, and not by any prohibition on Jehovah's Witness services. *See* Br. 56-57.

Scott ignores these cases. Instead, he insists that "[a]ttending communal worship is a key tenet of the Jehovah's Witness faith" and that his "ability to practice these beliefs is entirely dependent on whether the outside volunteers happen to show up." Scott Br. 19-20. But of course, that is precisely the point: the burden is caused by the availability of the

volunteers, and not by TDCJ's policy, just as this Court has repeatedly held.  Accordingly, Scott's RLUIPA claim fails at step one.

### 2. The Direct-Supervision Requirement Is The Least Restrictive Means Of Achieving TDCJ's Compelling Interests

**a.**  This Court's cases similarly foreclose Scott's argument at RLUIPA's step two.  In *Chance*, this Court explained that the direct-supervision requirement "is the least restrictive means of furthering TDCJ's compelling interest in prison administration."  730 F.3d at 415.  Indeed, multiple "decisions of this court confirm that TDCJ's volunteer policy is a permissible attempt to accommodate diverse religious exercises with limited resources."  *Id.* at 414; *see, e.g., McAlister v. Livingston*, 348 F. App'x 923, 936-37 (5th Cir. 2009) (per curiam) (explaining that the direct-supervision requirement "is supported by compelling interests in prison security").[8]

Once again, Scott simply ignores these cases.  And while he argues that the RLUIPA inquiry is always case-by-case, Scott Br. 19, we have

---

[8] These clear and forceful statements are far more significant than the observation, made in passing in *Newby v. Quarterman*, that the Muslim exception provides "some evidence" that inmate-supervised services can be conducted safely.  325 F. App'x 345, 352 (5th Cir. 2009) (per curiam).

explained that *all* of the factors *Chance* found relevant are present here. Br. 60-61.  And Scott makes no effort to articulate any relevant distinctions.

In any event, district courts should not second-guess this Court's assessments.  A holding by this Court that a policy is narrowly tailored to a compelling interest is "sufficient to preclude" future RLUIPA challenges to the policy.  *Longoria v. Dretke*, 507 F.3d 898, 904 (5th Cir. 2007) (per curiam).[9]  Indeed, in *Mayfield v. TDCJ* it was appropriate for the district court to evaluate the policy anew *only* because "no prior opinion of this court ha[d] fully evaluated the [direct-supervision] requirement to reach a holding that the policy is both supported by a compelling interest and is narrowly tailored."  529 F.3d 599, 615 n.11 (5th Cir. 2008).  Of course, that was written before this Court released *Chance*, an opinion that does precisely that.

---

[9] Even in this case, the district court initially rejected Scott's RLUIPA claim because the direct-supervision requirement furthered "the government's legitimate interest in prison security."  ROA.705; *see* ROA.173 (recognizing that "the Fifth Circuit has found that the volunteer policy is rationally related to a legitimate penological interest" because it is justified by TCDJ's interest in "prison safety and security").  The court gave no explanation for its eventual change of course.  *See* ROA.1706-07.

**b.** Even setting precedent aside, the direct-supervision requirement would easily survive the RLUIPA test. The dangers of leaving large groups of prisoners to their own devices are self-evident. As a federal commission noted, "[d]irect supervision . . . should be used wherever possible because it is the most effective mode of supervision for preventing sexual abuse and other types of violence and disorder." National Prison Rape Elimination Commission Report 6 (June 2009), *available at* https://www.ncjrs.gov/pdffiles1/226680.pdf. That is why this Court found direct supervision "reasonable and necessary," *Chance*, 730 F.3d at 415, and Judge Posner observed that its "reasonableness . . . cannot reasonably be doubted." *Johnson-Bey v. Lane*, 863 F.2d 1308, 1311 (7th Cir. 1988).

That is also why federal courts have upheld direct-supervision requirements in no fewer than twelve states,[10] often noting that direct

---

[10] *See, e.g., Hall v. Sutton*, 581 F. App'x 580, 583 (7th Cir. 2014) (Illinois); *Turner v. Hamblin*, 590 F. App'x 616, 620 (7th Cir. 2014) (Wisconsin); *Hathcock v. Cohen*, 287 F. App'x 793, 800-01 (11th Cir. 2008) (per curiam) (Florida); *McElhaney v. Elo*, 202 F.3d 269, at *4 (6th Cir. 2000) (Michigan); *Ben-Levi v. Brown*, No. 5:12-CT-3193-F, 2014 WL 7239858, slip op. at *3 (E.D.N.C. Dec. 18, 2014); *Manges v. Harman*, No. 3:11-CV-369-PPS, 2014 WL 5488457, slip op. at *10 (N.D. Ind. Oct. 29, 2014); *Guess v. McGill*, No. 9:13-CV-02260-TLW, 2014 WL 5106735, slip op. at *10-11 (D. S.C. Oct. 10, 2014); *Leishman v. Patterson*, No. 2:11-CV-00309-CW, 2014 WL 2117543, at *6-7 (D. Utah May 21, 2014) (mem. op.); *Vega v. Lantz*, No. 3:04-CV-1215-DFM, 2013 WL 6191855, at *5, *8 (D. Conn. Nov. 26, 2013) (mem. op.); *Jihad v. Fabian*, No. 09-1604, 2011 WL 1641885, at *19 (D. Minn. Feb. 17, 2011); *Strutton v. Meade*, No. 4:05-CV-

supervision enhances prison security, controls administrative costs, and limits the threat of creating hierarchies among inmates. *See, e.g.*, *Hamblin*, 590 F. App'x at 620; *Hathcock*, 287 F. App'x at 800; *Ben-Levi*, 2014 WL 7239858, at *3; *Vega*, 2013 WL 6191855, at *8. Other federal courts have recognized that the practice exists in at least six other states.[11]

Far from contradicting this wealth of experience, the record in this case further reinforces it. As detailed in the opening brief, TDCJ put on extensive evidence demonstrating that religious gatherings create a security threat, and that direct supervision alleviates that threat. Br. 8-12, 25-27, 63-66. The district court did not acknowledge any of this evidence. *See* ROA.806 (asserting that "TDCJ ha[d] presented *no evidence*" on the point (emphasis added)).

---

02022-ERW, 2010 WL 1253715, at *50 (E.D. Mo. Mar. 31, 2010); *Morrison v. Cook*, No. 97-57-ST, 1999 WL 717218, at *10 (D. Or. Apr. 27, 1999).

[11] *See, e.g.*, *Bader v. Wrenn*, 675 F.3d 95, 96 (1st Cir. 2012) (New Hampshire); *Ericson v. Magnusson*, No. 2:12-CV-00178-JAW, 2013 WL 2634761, at *4 (D. Me. June 12, 2013); *Howard v. Wiglesworth*, No. 5:10-CV-163-RHW, 2012 WL 3867011, at *5 (S.D. Miss. Sept. 5, 2012) (mem. op.); *Countryman v. Palmer*, No. 3:11-CV-00852-ECR-VPC, 2012 WL 4340659, at *5 (D. Nev. Aug. 7, 2012); *De'Lonta v. Johnson*, No. 7:11-CV-00175, 2012 WL 2921762, *2 (W.D. Va. July 17, 2012) (mem. op.); *Montague v. Corr. Corp. of Am.*, No. 3:10-CV-0443, 2011 WL 3476543, at *3 (M.D. Tenn. Aug. 8, 2011).

The court's failure to engage with the testimony of TDCJ prison administrators is particularly troubling.  As the Supreme Court explained in *Cutter v. Wilkinson*, "[i]t bears repetition . . . that prison security is a compelling state interest, and that deference is due to institutional officials' expertise in this area."  544 U.S. 709, 725 n.13 (2005); *see Holt v. Hobbs*, 135 S. Ct. 853, 864 (2015) (noting that "[p]rison officials are experts in running prisons and evaluating the likely effects of altering prison rules, and courts should respect that expertise").

**3.**    Scott, too, does not directly engage with the evidence. Instead, he responds primarily by attempting to create confusion as to how the direct-supervision requirement operates.  He insists that the presence of volunteers at religious services has no security benefits because "the State's policy in fact requires security personnel to be present even when a faith group has an available outside volunteer." Scott Br. 22.  This statement is false, as demonstrated by the very citation used to support it.  At ROA.164, the district court explains that "the TDCJ policy on religious programming requires the *availability* of security personnel as well as *the presence* of a TDCJ Chaplain or an approved volunteer." (emphases added).

22

In other words, security personnel provide *indirect* supervision, while volunteers provide the necessary *direct* supervision. It could not be otherwise. As a TDCJ administrator explained, TDCJ "do[es] not have the staff to put an officer into all these different religious services when a volunteer doesn't show up." *See* ROA.1976-81.

Nor is it the case that allowing volunteers to provide supervision would violate TDCJ policy. Scott Br. 21-22. While the policy does state that "[s]upervision of offenders is a staff function," it also explains that the rules "do[] not necessarily imply that the volunteer's assigned staff member *must be physically present* while the volunteer activity is being performed." ROA.339 (emphasis added); *see also* ROA.311 (explaining that, although the unit Chaplain must provide "direct *or general* supervision," prison staff "may draw upon approved religious volunteers *to help facilitate and conduct scheduled religious activity*" (emphases added)). In other words, the policy repeatedly makes clear that volunteers may directly supervise religious activities (as long as staff provides indirect supervision). *See* ROA.1982-83 (TDCJ administrator explaining that volunteers provide direct supervision and security staff provide indirect supervision).

Unsurprisingly, throughout this case the parties and the district court have referred to what volunteers do as "supervision." For instance, Scott himself complained, in a motion, that "there are very few Jehovah's Witness volunteers available to supervise services for Jehovah's Witness inmates." ROA.1667. And the district court observed that "[c]ivilian volunteers assist TDCJ by undergoing security training, then supervising many offenders' religious services when a chaplain is not present." ROA.676; *see also* ROA.163-64 (district court noting that policy "requires the presence of an approved volunteer . . . to supervise all group worship activities"). In short, it is Scott—and not TDCJ—who is retroactively recharacterizing the facts. Scott Br. 22.

**4.** Scott's other response is to insist that TDCJ's experience with allowing Muslims to meet without direct supervision—as required by the *Brown* consent decree—demonstrates that Jehovah's Witnesses could safely meet without direct supervision also. Scott Br. 24.[12] The first

---

[12] Scott also claims that Yahwehist and Buddhist inmates were exempt from direct supervision. Scott Br. 24. The district court made no findings to this effect, and TDCJ's witnesses testified to the contrary. Br. 51 n.12, 13. Moreover, the Yahwehist meetings fully complied with the direct-supervision requirement (because the inmate acknowledged that security staff were always present). ROA.1895; *see* Br. 51 n.12. And the only source for the claim about Buddhist inmates is Scott himself, Scott Br. 24 (citing ROA.1927-28), who admitted that he had no personal knowledge of the matter. ROA.1928. In any event, it is common for policies to be enforced imperfectly

problem with this logic is that, as the opening brief explained, there *have* been security problems at Muslim services. *See* Br. 9-10 (describing multiple disturbances at indirectly supervised Muslim services); *Davis v. Wall*, 50 F.3d 1033, at *2 (5th Cir. 1995) (describing a disagreement at a Muslim service which threatened to erupt into physical violence); *DeMoss v. Crain*, 636 F.3d 145, 156 (5th Cir. 2011) (per curiam) (noting that an incendiary videotape was shown at an unsupervised religious service).

Moreover, while the *Brown* consent decree was limited to Muslims, the district court's relief in this case could *not* be limited to Jehovah's Witnesses. Instead, as Scott and other witnesses acknowledged, the ruling would have a "ripple effect" on other religions. Br. 64, 11-12.

First, attempting to exclude other groups would create inmate resentment and expose TDCJ to accusations of favoritism. Br. 65 n.19. Second, there would be a cottage industry of litigation by other groups seeking the same privileges. Br. 64-65. Third, and most troublingly, under the district court's reasoning all of those other groups would very likely *win*. Br. 65. In other words, the district court ruling—if it is

---

in the challenging prison environment. *See, e.g.*, *Manges*, 2014 WL 5488457, at *11 ("imperfect enforcement" means only that "running a prison is an 'inordinately difficult undertaking'" (quoting *Turner v. Safley*, 482 U.S. 78, 84 (1987)).

upheld—threatens to force TDCJ either to allow all groups to meet without direct supervision (which would be unacceptably dangerous), or to provide direct supervision for all services (which would be unacceptably expensive, Br. 12).[13]

As the opening brief demonstrated, courts routinely accept consequences of this sort as a justification for restrictions on religious accommodations. Br. 64-66 & n.19. Scott, however, suggests that this all came to an end with *Holt*. Scott Br. 28-29. Not so. The ripple effect argument in *Holt* failed because prison officials made no effort to tie their concern to "a compelling interest in cost control or program administration." 135 S. Ct. at 866. Here, TDCJ showed why both of those objectives would be compromised.[14]

---

[13] Scott argues that the estimate of almost $10 million per year is overstated, because *some* religions may be able to meet together and *some* services could be supervised by volunteers. Scott Br. 29. However, even if the estimate is overstated by a factor of ten, the costs would still be approximately a million dollars a year. In *Chance*, this Court declined to require TDCJ to spend even one hundred thousand dollars a year. 730 F.3d at 413.

[14] The other two cases cited by Scott are similarly unhelpful to his position. Scott Br. 29. *Gonzales v. O Centro Espirita Beneficente Uniao de Vegetal* expressly noted that "the Government can demonstrate a compelling interest in uniform application of a particular program by offering evidence"—as TDCJ did here—"that granting the requested religious accommodations would seriously compromise its ability to administer the program." 546 U.S. 418, 435 (2006). And *Burwell v. Hobby Lobby Stores, Inc.* rejected an implausible slippery slope argument that was—unlike TDCJ's argument here—"an objection to [the statute] itself." 134 S. Ct. 2751, 2784 (2014).

## III.   THE COURT IMPOSED AN UNWARRANTED REMEDY

### A.   The Court Should Have Accepted The Scott Plan

The opening brief made two points concerning the district court's rejection of the Scott Plan.  First, the district court erred in holding that the Scott Plan violates the Free Exercise Clause.  Br. 66-67.  Second, assuming that the *Brown* consent decree created an Establishment Clause violation, the Scott Plan would remedy that violation.  Br. 67-68.  Scott contests neither of these points.  Scott Br. 34.

### B.   The Court's Remedy Violates The PLRA

#### 1.   The Injunction Is Not Narrowly Drawn

a.   The PLRA requires prospective relief to be "narrowly drawn." 18 U.S.C. § 3626(a)(1)(A).  The district court's injunction is overbroad in at least four respects.

*First*, the injunction extends to all Jehovah's Witnesses at TDCJ. Br. 70.  The PLRA explicitly provides that the relief must "extend no further than necessary to correct the violation of the Federal right *of a particular plaintiff or plaintiffs*."  18 U.S.C. § 3626(a)(1)(A) (emphasis added).  Scott has not even attempted to argue that an injunction governing *all* TDCJ Jehovah's Witnesses is necessary to remedy any violation of *his* rights.  Instead, he makes the vague observation that "this

27

is how both parties litigated the case." Scott Br. 34. He notes, in particular, that the Scott Plan—proposed by TDCJ—covered inmates of all faiths. Scott Br. 35. But TDCJ is free to adopt a compliance plan of any breadth; the district court, by contrast, may not impose conditions that directly violate the text of the PLRA.

*Second*, the injunction guarantees Jehovah's Witnesses at least four hours a week of group religious activities. Br. 70. Scott suggests that Jehovah's Witnesses "should participate in at least three weekly communal services," each of which lasts about an hour. Scott Br. 35. But there is no evidence that even *one* service—let alone three—was required by Scott's faith. ROA.1884-85. And while Scott testified that one of the three *encouraged* weekly meetings lasts over 45 minutes, ROA.1882-83, he gave no testimony at all concerning the length of the other two meetings. As such, it remains the case that the four-hour minimum rests on no record evidence.

*Third*, the injunction provides that Jehovah's Witness services may not be led by any chaplain, volunteer, or inmate who is not a Jehovah's Witness. Br. 70. This is an accommodation enjoyed by no other religion

in TDCJ.[15]  And it finds no support in the district court's findings, which state only that Scott "has *alleged* that Jehovah's Witnesses are not allowed to mingle with non-Witnesses in religious services."  ROA.703 (emphasis added).

*Fourth*, and most notably, the injunction drastically curtails TDCJ's ability to respond to emergencies.  Br. 71.  Specifically, TDCJ is forbidden from interrupting Jehovah's Witness services for more than two weeks in a row, or more than five weeks in a calendar year, at any given unit—regardless of exigent circumstances such as power outages, natural disasters, and prison riots.  ROA.1743-44.  This troubling incursion into an "area[] of core state responsibility" raises "sensitive federalism concerns."  *Horne v. Flores*, 557 U.S. 433, 447-49 (2009). Congress passed the PLRA precisely to "extricate [federal courts] from managing state prisons" in this way.  *Guajardo v. TDCJ*, 363 F.3d 392, 394 (5th Cir. 2004) (per curiam) (internal quotation marks omitted).

---

[15] Scott claims that Muslims have the same right under the *Brown* consent decree. Scott Br. 36.  But the consent decree is not currently in effect. The district court reinstated portions of it in *Brown*, but that ruling was stayed by this Court and is currently on appeal.  Br. 27.

The district court gave no justification for these restrictions. Scott points (at 36) to the State's supposed "refusal to comply in good faith" with *Hyde v. TDCJ*, 948 F. Supp. 625, 627 (S.D. Tex. 1996)—a decision that is otherwise unmentioned in his brief. This is no surprise; as the opening brief explained, the narrow and limited judgment in *Hyde* is essentially irrelevant to this case. Br. 51 n.13. And the district court made no finding that TDCJ violated *Hyde* at all, much less in bad faith. Certainly there is no suggestion of the sort of extraordinary wrongdoing that could conceivably justify a blanket order disregarding the State's judgment concerning prison emergencies.

Scott also argues that these restrictions are warranted because, in 2011, "only three Jehovah's Witness services were cancelled due to emergency-type situations." Scott Br. 37. If anything, this proves that the restriction is unnecessary because the State does not abuse the power to cancel services due to emergencies. It certainly does *not* suggest that more emergencies could not occur in a different year.

**b.** As a last resort, Scott asserts that these arguments are waived. Scott Br. 37. Under Rule 46, "a party need only state the action that it wants the court to take or objects to, along with the grounds for

the request or objection." As Scott concedes, "it is clear that the State objected to the district court granting any relief to Scott." Scott Br. 37. Nothing more was required.

Scott complains that we did not object to the specifics of the proposed final judgment. But as we pointed out without contradiction, Scott himself made *no* argument in support of those specifics in any of his filings. Br. 69-70. The State opposed his requested relief at the same level of detail at which he defended it.

In any event, the purposes of Rule 46 are served if the district court is aware of a party's position and a party's desired results. *See Hartford Lloyd's Ins. Co. v. Teachworth*, 898 F.2d 1058, 1060-61 (5th Cir. 1990). Here, the district court knew that the State objected to any relief, and, in the alternative, viewed the Scott Plan as the appropriate form of relief. Moreover, in defending the Scott Plan, the State specifically invoked the PLRA's narrow-tailoring requirement. ROA.737. In other words, the State easily did enough "to permit the district court to rule on [these

arguments].” *In re Liljeberg Enters., Inc.*, 304 F.3d 410, 427 n.29 (5th Cir. 2002).[16]

## 2. The Court Did Not Give Sufficient Weight To Public Safety

The PLRA requires courts to “give substantial weight to any adverse impact on public safety or the operation of a criminal justice system.” 18 U.S.C. § 3626(a)(1)(A). This means, at a minimum, “giv[ing] due deference to informed opinions as to what public safety requires.” *Brown v. Plata*, 131 S. Ct. 1910, 1946 (2011). Accordingly, the district court was obligated, at least, to consider the testimony of TDCJ’s expert administrators. But the court never engaged with that testimony, or any of TDCJ’s evidence. Indeed, it did not even reckon with this Court’s opinions conclusively establishing that direct supervision promotes prison security. *See, e.g.*, *Chance,* 730 F.3d at 414-15. As such, the district court failed to give substantial weight to public safety.

---

[16] Scott is also wrong to argue that the State was obligated to move for reconsideration after the final judgment was entered. Scott Br. 38. *See Teachworth*, 898 F.2d at 1061 (explaining a “failure to move for reconsideration” did not waive a party’s “challenge to the court’s ruling”).

## CONCLUSION

The Court should reverse the district court's judgment and instruct the district court to (1) dismiss the case as moot; or (2) enforce the parties' settlement agreement; or (3) reject Scott's claims on the merits; or (4) accept the state's proposed compliance plan; or (5) adopt a remedy which complies with the PLRA.

Respectfully submitted.

KEN PAXTON
Attorney General of Texas

CHARLES E. ROY
First Assistant Attorney General

SCOTT A. KELLER
Solicitor General

/s/ Alex Potapov
ALEX POTAPOV
DOUGLAS D. GEYSER
Assistant Solicitors General

AUTUMN HAMIT PATTERSON
Assistant Attorney General

OFFICE OF THE ATTORNEY GENERAL
P.O. Box 12548 (MC 059)
Austin, Texas  78711-2548
Tel.: (512) 936-2221
Fax: (512) 474-2697

COUNSEL FOR DEFENDANT-APPELLANT

### CERTIFICATE OF SERVICE

I certify that on May 4, 2015, the foregoing document was served, via the Court's CM/ECF Document Filing System, https://ecf.ca5.uscourts.gov/, upon counsel for all parties.

I further certify that on May 4, 2015, the foregoing document was transmitted to Mr. Lyle W. Cayce, Clerk of the United States Court of Appeals for the Fifth Circuit, via the Court's CM/ECF Document Filing System, https://ecf.ca5.uscourts.gov/.

I further certify that 1) required privacy redactions have been made in compliance with Fifth Circuit Rule 25.2.13; 2) the electronic submission is an exact copy of the paper document in compliance with Fifth Circuit Rule 25.2.1; and 3) the document has been scanned with the most recent version of Symantec Endpoint Protection and is free of viruses.

/s/ Alex Potapov
ALEX POTAPOV

## CERTIFICATE OF COMPLIANCE

### With Type-Volume Limitation, Typeface Requirements, and Type Style Requirements

1.    This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because:

[ X ]  this brief contains 6,980 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii), or

[  ]   this brief uses a monospaced typeface and contains [state the number of] lines of text, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.    This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

[ X ]  this brief has been prepared in a proportionally spaced typeface using Microsoft Word for Windows in Century Schoolbook Font 14-point type face, or

[  ]   this brief has been prepared in a monospaced typeface using [state name and version of word processing program] with [state number of characters per inch and name of type style].

/s/ Alex Potapov
ALEX POTAPOV

COUNSEL FOR DEFENDANT-APPELLANT

Dated:  May 4, 2015